UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JKAYC, LLC,

                            Plaintiff,

                  - against -

NOAH BANK,

                         Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-943 (PKC) (SMG)

PAMELA K. CHEN, United States District Judge:

On January 4, 2021, the Honorable Steven M. Gold, Magistrate Judge, granted the motion of Defendant Noah Bank to disqualify attorney Robert J. Basil and his law firm, the Basil Law Group, P.C. ("BLG"), from representing Plaintiff JKAYC, LLC ("JKAYC") in this matter. JKAYC moves for reconsideration of Judge Gold's order under Federal Rule of Civil Procedure 72(a). The Court denies JKAYC's motion.

## BACKGROUND

### I.    Factual Background

On October 19, 2018, Noah Bank leased a commercial property from JKAYC located in Bayside, New York. (*See* State Court Records and Proceedings ("Compl."), Dkt. 2, at ECF[1] 11.) The lease agreement ("Lease") anticipated that Noah Bank, after performing certain construction work on the premises, would operate a bank branch at the subject property. (*Id.* at ECF 3, 7 (¶¶ 5–6, 27–29).) The Lease provided that Noah Bank "would be responsible for obtaining any and all federal and state regulatory approvals, licenses, and permits required to conduct [its] banking business" on the premises, and that, if Noah Bank failed to obtain the required approvals by

---

[1] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

October 19, 2019, the Lease would automatically terminate.  (*Id.* at ECF 3 (¶¶ 6(e)–(f)); *see also id.* at ECF 12 (¶¶ 2.02, 4.01).)  The Lease also included a rider ("Rider"), which specified:

> [Noah Bank] represents that [it] will complete the construction of the Premises and obtain a final certificate of occupancy of the Premises within eighteen (18) months after it obtains all permits required to undertake the construction necessary to legally operate the bank on the leased Premises (the "Construction Completion Date").  In the event that the construction shall not be completed within the above-referenced period, [Noah Bank] shall begin to pay the Fixed Rent after [the] Construction Completion Date.

(*Id.* at ECF 10.)

On August 9, 2019, JKAYC received notice from Noah Bank's general counsel that Noah Bank was "exercising its right" to terminate the Lease, and that Noah Bank did not plan to take occupancy of the subject property.  (*Id.* at ECF 5 (¶ 11).)

## II.   Procedural Background

On November 20, 2019, JKAYC sued Noah Bank in the New York Supreme Court, New York County (*see id.* at ECF 1; Notice of Removal, Dkt. 1, ¶ 1), for breaching the Lease and the covenant of good faith and fair dealing (Compl., Dkt. 2, at ECF 6–7 (¶¶ 23–29)).  The complaint was signed by Robert J. Basil of BLG (*see id.* at ECF 8), and JKAYC is represented in this action by Basil and David Cohen of BLG (*see* Dkts. 9, 12).

On December 17, 2019, Noah Bank removed the case to the United States District Court for the Southern District of New York on the basis of diversity jurisdiction.  (*See* Dkt. 1.)  Noah Bank filed counterclaims for breach of contract, unjust enrichment, and conversion, seeking repayment of a $400,000 security deposit it had paid to JKAYC.  (Answer & Counterclaims, Dkt. 7, at 5–6.)  On February 20, 2020, the parties consented to transfer of the case to this Court.  (Dkt. 10.)

On September 25, 2020, Noah Bank moved to disqualify BLG from representing JKAYC in this matter based on a conflict of interest.  (Dkt. 19.)  Noah Bank asserted that (1) Noah Bank

"is a long-time (now former) client of []BLG;" (2) "Jerry J. Kim, Esq., who represented Noah Bank in connection with the negotiation of the lease agreement at issue in this litigation, is and was Of Counsel to, and/or held out as a member of, []BLG;" and (3) "Robert J. Basil, Esq., JKAYC's lead counsel in this matter, actively participated in the representation of Noah Bank in connection with the negotiation of the lease at issue in this litigation." (Dkt. 19-1 at 1.) Noah Bank's general counsel affirmed that BLG, and Basil in particular, "have acted as outside counsel to Noah Bank on a number of matters over a long period of time." (Declaration of Glenn R. James ("James Decl."), Dkt. 19-2, ¶ 2.)

In support of its motion, Noah Bank introduced evidence that it had been a client of BLG until about five months before this lawsuit began. (*See id.* ¶¶ 2–3; *see also* Declaration of Robert J. Basil ("Basil Decl."), Dkt. 28-3, ¶¶ 31, 42.) It offered evidence that Kim had represented Noah Bank in negotiating and drafting the Lease. (James Decl., Dkt. 19-2, ¶ 4.) Kim acknowledged that he shared office space with BLG, copied Basil on relevant emails, and solicited Basil's assistance in drafting the Rider paragraph of the Lease. (Declaration of Jerry J. Kim ("Kim Decl."), Dkt. 28-1, ¶¶ 25–26.) Email correspondences between the parties confirmed that Basil had drafted the Rider. (*See* Dkt. 23, at ECF 10, 14, 18—SEALED; *see also* Basil Decl., Dkt. 28-3, ¶¶ 21–22, 27–28.) The emails also showed that, in drafting the Lease for Noah Bank, Kim copied Basil on various correspondences connected to the case (*see* Dkt. 23, at ECF 2, 6, 10, 14, 17, 18—SEALED), including one in which Noah Bank's President commented on the Lease and expressed interest in another potential property (*see id.* at 16–17).

## III.   Judge Gold's Decision

On January 4, 2021, Judge Gold granted Noah Bank's motion to disqualify BLG as counsel. (*See* January 4, 2021 Memorandum & Order ("Disqualification Order"), Dkt. 30.) Judge Gold found that the "exchanges [involving Kim and Basil] demonstrate at least some relationship

between BLG's prior representation of Noah Bank and the issues raised in this lawsuit." (*Id.* at 6.) Judge Gold explained that "[w]hether Noah Bank could complete construction within the time set forth in the rider drafted by Basil would depend in part on when it secured the permits and approvals required for construction and for permission to operate a bank branch at the Property." (*Id.* at 7.) Further, "[Noah Bank's President's] enthusiasm about the opportunity to open a bank branch in [another location] may also be relevant to whether Noah Bank was motivated to find a way out of the Lease Agreement." (*Id.*) Judge Gold also observed that "during the time when Noah Bank was obligated by the Lease to be seeking the permits and regulatory approvals at issue, BLG was representing Noah Bank in twenty matters and [Noah Bank's President] in three." (*Id.*) Judge Gold concluded that "[u]nder these circumstances, it seems very likely that Basil and other lawyers at BLG became aware of privileged information regarding whether or not Noah Bank was making a good faith effort to obtain the permits and other approvals it was required to secure under the Lease." (*Id.*)

Although Basil and Noah Bank's President attested that they did not communicate about Noah Bank's efforts to obtain the regulatory approvals at issue, Judge Gold reasoned that "these statements . . . do not address a related core issue: whether Basil and BLG had access to privileged information regarding Noah Bank's motives to avoid its obligations under the Lease." (*Id.* at 8.) Judge Gold noted that Basil "twice served as an official at Noah Bank's annual shareholders' meetings and met from time to time with bank officers and directors 'concerning various bank matters, almost entirely regarding litigation matters.'" (*Id.* (quoting Basil Decl., Dkt. 28-3, ¶ 49).) "Noah Bank's financial condition," Judge Gold found, "might well bear upon its motives for completing or avoiding its obligations under the Lease." (*Id.*) Further, Basil and "BLG had recently defended Noah Bank and [its President] in a civil RICO case," which likely would have

been "relevant to its motives with respect to the Lease." (*Id.*)  Judge Gold concluded that "given Basil's extensive involvement in the affairs of Noah Bank and those of [its President] during the time period critical to the issues in this case, the likelihood that he was exposed to relevant privileged information is sufficiently great to warrant his disqualification." (*Id.*)

Next, Judge Gold found that Kim's conflicts could be imputed to BLG.  Judge Gold noted "Kim's willingness to involve Basil in his work—both by copying him on emails and asking him to draft a rider to the Lease[—and] . . . that Kim and BLG shared an office space, Kim included Basil's name on his letterhead, and BLG appears to have charged Noah Bank for Kim's legal services on a single invoice listing both Kim's and Basil's hours." (*Id.* at 9 (citations omitted).) Further, "Kim . . . made a practice of copying Basil on emails because of BLG's superior document retention system, which appears to be yet another avenue through which Basil likely acquired relevant privileged information." (*Id.* (citation omitted).)  Finally, Kim joined BLG's criminal defense team for Noah Bank's President in a case in mid-2019, further suggesting a close working relationship between Kim and BLG.  (*Id.* at 9–10.)

Judge Gold also concluded that the prejudice to JKAYC of disqualifying BLG would be minimal, given that depositions had not yet begun, and that "any reasonable additional time that new counsel for JKAYC might require to become familiar with the case will be provided." (*Id.* at 10.)  Further, "any difficulty JKAYC now faces in obtaining new counsel could have been avoided; before this suit was filed, and prior to Noah Bank's receipt of the emails that inspired this motion, Noah Bank apparently sent two letters to JKAYC's lead counsel stating th[at] BLG had a conflict of interest in this matter." (*Id.*)

For all of these reasons, Judge Gold granted the motion to disqualify BLG.

## STANDARD OF REVIEW

A district court may refer "a pretrial matter not dispositive of a party's claim or defense . . . to a magistrate judge to hear and decide." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). Once the magistrate judge issues a decision, a party may object within 14 days. Fed. R. Civ. P. 72(a). The district court may vacate the magistrate judge's decision "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A). "[B]ecause motions for disqualification of counsel are non-dispositive," a magistrate judge's decision is "entitled to th[is] more deferential standard of [review]." *Eur. Cmty. v. RJR Nabisco, Inc.*, 134 F. Supp. 2d 297, 302 n.5 (E.D.N.Y. 2001) (collecting cases).

"A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Castillo v. G&M Realty L.P.*, 950 F.3d 155, 167 (2d Cir. 2020), *as amended* (Feb. 21, 2020) (citations and quotations omitted), *cert. denied sub nom. G & M Realty L.P. v. Castillo*, 141 S. Ct. 363 (2020). "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (citation and alteration omitted). Under the clear error standard, therefore, "[a] finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017). "[U]nder the 'contrary to law' standard of review, a district court may reverse a finding only if it finds that the magistrate failed to apply or misapplied relevant statutes, case law or rules of procedure." *Garcia v. Benjamin Grp. Enter. Inc.*, 800 F. Supp. 2d 399, 403 (E.D.N.Y. 2011) (citation, quotations, and brackets omitted).

## DISCUSSION

### I.      Legal Standard – Disqualification of Attorneys

"The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (citation and quotations omitted).  "In exercising this power, [courts] balance a client's right freely to choose his [or her] counsel against the need to maintain the highest standards of the profession." *Id.* (citations and quotations omitted).

"The standard for disqualification varies depending on whether the representation is concurrent or successive." *Id.* at 133.  "In cases of concurrent representation, . . . it is prima facie improper for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." *Id.* (citation and quotations omitted).  In cases of successive representation, "disqualification is warranted where:" (1) "the moving party is a former client of the adverse party's counsel;" (2) "there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit;" and (3) "the attorney whose disqualification is sought had access to, or was likely to have had access to, the relevant privileged information in the course of his [or her] prior representation of the client." *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 239 (2d Cir. 2016) (citations omitted).

The Second Circuit explained in *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739–40 (2d Cir. 1978), a case decided in 1978, that a "substantial relationship" is one where "the relationship between issues in the prior and present cases is 'patently clear.'" (citation omitted).  The court noted in *Government of India* that "disqualification ha[d] been granted or approved recently only when the issues involved [were] 'identical' or 'essentially the same.'" *Id.* (collecting cases from the 1970s).  In 2016, the Second Circuit clarified that "[a] 'substantial

relationship' exists where facts pertinent to the problems underlying the prior representation are relevant to the subsequent representation." *Prevezon*, 839 F.3d at 239 (citations omitted).[2]

"Once a substantial relationship between the cases is established, where the same individual lawyer participated in the prior and current representation, the movant is not required to make a specific showing that confidences were passed to counsel." *Id.* at 240 (citation and quotations omitted). "Instead, the movant is entitled to the benefit of an irrebuttable presumption that confidences were shared." *Id.* (citation omitted). Where different attorneys from the same law firm participated in the prior and current cases, disqualification still may be appropriate, because "[a]n attorney's conflicts are ordinarily imputed to his [or her] firm based on the presumption that 'associated' attorneys share client confidences." *Hempstead*, 409 F.3d at 133.

In deciding whether to impute an "of counsel" attorney's conflict to a law firm for purposes disqualification, "[t]he first step . . . is to determine whether [the 'of counsel'] attorney is 'associated' with the firm." *Id.* at 134. "If he [or she] is, a rebuttable presumption arises that the attorney and the firm share client confidences, and the court then proceeds to the second step, which involves determining whether that presumption has been rebutted." *Id.*

"Whether an attorney is associated with a firm for purposes of conflict imputation depends in part on the existence and extent of screening between the attorney and the firm." *Id.* (citing

---

[2] Since 2016, "[s]ome courts have continued to apply the *Government of India* standard, while other courts have applied *Prevezon*." *United States v. Huawei Techs. Co.*, No. 18-CR-457 (S-2) (AMD), 2020 WL 903007, at *4 (E.D.N.Y. Feb. 25, 2020). *Compare Jose Luis Pelaez, Inc. v. McGraw-Hill Global Educ. Holdings LLC*, 366 F. Supp. 3d 567, 573 (S.D.N.Y. 2019) (applying *Government of India*), *with Tour Tech. Software, Inc. v. RTV, Inc.*, No. 17-CV-5817 (CLP), 2018 WL 3682483, at *5 (E.D.N.Y. Aug. 2, 2018) (applying *Prevezon*). "Other courts cite both cases to define the substantial relationship prong." *Huawei Techs.*, 2020 WL 903007, at *4 (citing *Bakken Res., Inc. v. Edington*, No. 15-CV-8686 (ALC), 2017 WL 1184289, at *2 (S.D.N.Y. Mar. 29, 2017)). To the extent the standards differ, the Court determines that Judge Gold did not clearly err under either.

New York State Bar Ass'n Comm. on Prof'l Ethics, Op. 715 (1999)).  "An 'of counsel' attorney, who handles matters independent of his [or her] firm and scrupulously maintains files for his [or her] private clients separate from the files of the firm, is less likely to be considered associated with the firm with respect to those clients than another attorney in the same position whose client files are not effectively segregated from those of the firm."  *Id.*  "Similarly, whether the screening between an attorney and his [or her] firm is considered adequate to rebut the presumption of shared confidences depends in part on the closeness and extent of the relationship between the attorney and the firm."  *Id.*

Finally, "disqualification is called for only where an attorney's conduct tends to taint the underlying trial."  *Prevezon*, 839 F.3d at 241 (citation and quotations omitted).  "Generally, where [the three disqualification] factors are satisfied, trial taint is established and no further analysis is necessary."  *Id.* (citation omitted).

Although disqualification "is a drastic measure that is viewed with disfavor in this Circuit," courts "have broad discretion to disqualify attorneys."  *Canfield v. SS&C Techs. Holdings, Inc.*, No. 18-CV-8913 (ALC), 2020 WL 3960929, at *2 (S.D.N.Y. July 10, 2020), *reconsideration denied*, 2021 WL 1026128 (S.D.N.Y. Mar. 17, 2021).  And "where the record presents a close question as to whether disqualification would be appropriate, courts must resolve any doubts in favor of disqualification."  *Benevida Foods, LLC v. Advance Mag. Publishers Inc.*, No. 15-CV-2729 (LTS) (DF), 2016 WL 3453342, at *10 (S.D.N.Y. June 15, 2016) (quotations omitted) (citing, among others, *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) ("[I]n the disqualification situation, any doubt is to be resolved in favor of disqualification.")).

## II.    JKAYC's Counsel Was Properly Disqualified

Applying these principles, the Court reviews Judge Gold's decision to disqualify Basil and BLG as JAYKC's counsel in this matter to determine whether the "order is clearly erroneous or

contrary to law." 28 U.S.C. § 636(b)(1)(A). More specifically, the Court reviews for clear error whether Judge Gold appropriately concluded that (A) Noah Bank is BLG's former client, (B) the present matter substantially relates to BLG's prior representation of Noah Bank, and (C) BLG had access to confidential information relevant to the present matter.

### A.     Judge Gold Appropriately Found That Noah Bank Is BLG's Former Client

The parties do not dispute Judge Gold's conclusion that BLG represented Noah Bank in prior cases and now represents JKAYC. In mid-2019, months before this litigation began, BLG was representing Noah Bank in approximately 20 matters and Noah Bank's President in three. (*See* Basil Decl., Dkt. 28-3, ¶¶ 31, 36–37.) Noah Bank terminated BLG as counsel on June 14, 2019. (*See id.* ¶ 42[3]). BLG and Basil have appeared in the present case on behalf of JKAYC, and Basil signed the complaint. (*See* Dkt. 9; Compl., Dkt. 2, at ECF 8.) Thus, the first element required for disqualification is met.

### B.     Judge Gold Appropriately Found That BLG's Past Representation of Noah Bank Substantially Relates to Its Present Representation of JKAYC

Judge Gold found that BLG's past representation of Noah Bank substantially relates to the present litigation. (*See* Disqualification Order, Dkt. 30, at 6–7.) JKAYC contends that Judge Gold "misappli[ed] the relevant legal standard" in finding a substantial relationship between the two representations. (Plaintiff's Motion to Set Aside Magistrate Judge's Order ("Pl. Mot."), Dkt. 31-1, at 14.) As a threshold matter, JKAYC's challenge concerns Judge Gold's factual findings, not legal conclusions. *See, e.g.*, *Prevezon*, 839 F.3d at 238 (applying the "clear error" standard to the court's "analysis of the substantial relationship between the representations"); *accord Laker*

---

[3] Although Basil avers in his Declaration that Noah Bank terminated BLG on June 14, *2020*, the Declaration attaches an email dated June 14, 2019 announcing the termination. The Court assumes, as did Judge Gold, that the 2019 date is correct and the 2020 date is an error. (*See* Basil Decl., Dkt. 28-3, ¶ 42.)

*Airways Ltd. v. Pan Am. World Airways*, 103 F.R.D. 22, 38 (D.D.C. 1984) ("It is a question of fact whether there is a substantial relationship between present litigation and a previous matter or cause of action.").  The Court thus considers whether Judge Gold's finding of a substantial relationship is a "permissible view[] of the evidence," *Bershchansky*, 788 F.3d at 110 (citation omitted), or, instead, leaves the Court "with the definite and firm conviction that a mistake has been committed," *Castillo*, 950 F.3d at 167.

JKAYC first cites *Hickman v. Burlington Bio-Medical Corp.*, 371 F. Supp. 2d 225, 230 (E.D.N.Y. 2005), and *Giambrone v. Meritplan Insurance Co.*, 117 F. Supp. 3d 259, 273 (E.D.N.Y. 2015), to argue that "[]BLG's general knowledge of Noah Bank's operations creates no 'substantial relationship' with the present matter."  (Pl. Mot., Dkt. 31-1, at 12.)  But *Hickman* and *Giambrone* support that proposition only when the moving party seeks disqualification on the basis that counsel's "general representation . . . gave the attorney insight into or access to *litigation strategies or similar information*," *Giambrone*, 117 F. Supp. 3d at 273 (emphasis added), or "[w]here the only allegation of similarity is the attorney's alleged insight into the former client's '*general "litigation thinking*,"'" *Hickman*, 371 F. Supp. 2d at 230 (emphasis added) (citations omitted).  As explained in *Hickman*, finding a substantial relationship based on an attorney's insight into a former client's "general 'litigation thinking'" "would mandate disqualification in virtually every instance of successive representation[,] which clearly is not the law." *Id.* (citation and quotations omitted).  Because there was no evidence in either *Hickman* or *Giambrone* that the matters the attorney had worked on for the previous client had any "factual relationship, much less any 'substantial' relationship, to the[] issues" in the later case, those courts found disqualification unwarranted. *Id.* at 231; *see Giambrone*, 117 F. Supp. 3d at 274 (declining to disqualify the plaintiff's counsel in a breach of contract suit, where "[t]here [was] no evidence that [the attorney]

handled any case involving even similar questions of fact," let alone any evidence "that he negotiated th[e] contract, reviewed it, or was even aware of it.").  That is not the situation here. Judge Gold did not base his decision on BLG's knowledge of Noah Bank's "general 'litigation thinking,'" but rather on the "relationship between BLG's prior representation of Noah Bank and the issues raised in this lawsuit."  (Disqualification Order, Dkt. 30, at 6.)

Next, JKAYC argues that "[t]here is no common issue between [Basil's] drafting of the Rider and Noah Bank's subsequent efforts to extricate itself from the Lease."  (Pl. Mot., Dkt. 31-1, at 12.)  JKAYC notes that the main issue in this case is "whether Noah Bank attempted in good faith to satisfy Section 4.01 [of the Lease] by obtaining banking department approvals."  (*Id.* at 4.) JKAYC points out that Noah Bank did not seek to terminate the Lease based on the Rider Basil drafted, but, rather, sought to terminate the Lease on the ground that Noah Bank was unlikely to receive the relevant construction approvals and thus would "consider Section 4.01 of the Lease Agreement to be activated such that he [sic] Lease Agreement [would] terminate on that date without further obligation of either party to the other."  (Compl., Dkt. 2, at ECF 5 (citation and quotations omitted).)  According to JKAYC, therefore, "[]BLG's limited role in drafting the Lease's Rider has no bearing on Noah Bank's decision to violate the Lease."  (Pl. Mot., Dkt. 31-1, at 13.)

But the Rider Basil drafted specifies the consequences of Noah Bank's failure to complete construction after obtaining the requisite approvals.  It provides that Noah Bank "will complete the construction of the Premises . . . within eighteen (18) months after it obtains all permits" or else "begin to pay [rent]."  (Compl., Dkt. 1, at ECF 10.)  JKAYC in the present litigation "alleges it is due damages set forth in the Lease *and Construction Rider*," including "the costs to finish the construction."  (Declaration of Kelly A. Zampino ("Zampino Decl."), Dkt. 29-2, at ECF 7–8

(emphasis added).)  And although it may not be the *primary* issue in the case, JKAYC also appears to allege that Noah Bank breached the Rider.  In response to Noah Bank's interrogatory asking JKAYC to "[i]dentify every breach of the Lease by Noah Bank," JKAYC replied that "[t]he Lease *and Rider* . . . speaks for itself."  (*Id.* at ECF 8–9 (emphasis added).)  The Rider also is identified in the Complaint (*see* Compl., Dkt. 2, at ECF 4), and, as noted, is listed as a source of damages (*see* Zampino Decl., Dkt. 29-2, at ECF 7–8).  Even if the main dispute in the case is whether Noah Bank sought the requisite approvals in good faith, one "permissible view[] of the evidence" is that JKAYC has put the terms of the Rider in issue by alleging its breach and invoking it as a source of damages.  *See Bershchansky*, 788 F.3d at 110 (citation omitted).  To the extent liability or damages turn on the interplay between the Lease and Rider, or on the meaning of the language in the Rider, Judge Gold did not clearly err by finding that BLG's "successive representations [of Noah Bank and then JKAYC] share common material factual issues."  *Giambrone*, 117 F. Supp. 3d at 272 (collecting cases); *cf. AVRA Surgical, Inc. v. Dualis MedTech GmbH*, No. 13-CV-7863 (DC), 2014 WL 2198598, at *2–4 (S.D.N.Y. May 27, 2014) (disqualifying counsel who represented an adverse party in negotiating the agreement that was the subject of the later lawsuit).

In any event, Judge Gold did not disqualify BLG simply because JKAYC invokes the Rider in alleging breach and seeking damages.  Rather, Judge Gold determined that Basil's drafting of that Lease provision, and his receipt of emails connected to the drafting process, shows that he was aware of the terms of the Lease and thus of Noah Bank's efforts to comply (or lack thereof) in the months he continued to represent Noah Bank after the Lease took effect.  For example, as Judge Gold pointed out, Basil was copied on an email, during the process of drafting the Lease, where Noah Bank's President expressed enthusiasm about the prospect of opening a bank branch at a different location from the one Noah Bank and JKAYC were negotiating.  Judge Gold found this

potentially "relevant to whether Noah Bank was motivated to find a way out of the Lease Agreement," and, in turn, whether Basil had relevant privileged information. (Disqualification Order, Dkt. 30, at 7.)

JKAYC argues that "[t]his is sheer speculation" that "baselessly equates [Noah Bank's President]'s hope for favorable terms at a [different] location with a plan to terminate the Lease." (Pl. Mot., Dkt. 31-1, at 8.)  But not only was Judge Gold's finding a "permissible view[] of the evidence," *Bershchansky*, 788 F.3d at 110 (citation omitted), it was *JKAYC's* view of the evidence until the disqualification litigation began.  In its interrogatories in the present case, Noah Bank asked JKAYC to specify "[w]hat evidence" there was that Noah Bank's "failure to undertake one or more of the requirements [for obtaining approvals] was intentional, in bad faith, and/or for the purpose of manufacturing a false justification to avoid its obligations under the Lease." (Zampino Decl., Dkt. 29-2, at ECF 107 (quoting Compl., Dkt. 2, at ECF 4, 6).)  JKAYC responded that there was direct evidence of bad faith, and "also circumstantial evidence in the fact that Noah Bank delayed seeking approval for this branch *while aggressively seeking approval of other branch(es) at about the same time*."  (*Id.* at 107–08 (emphasis added).)  That Noah Bank might have been seeking other leases at the same time it negotiated the Lease with JKAYC seems at least relevant to this point.  JKAYC cannot, on the one hand, seek to use Noah Bank's efforts to open other branches as evidence of its bad faith and, on the other, call that connection "baseless" or "sheer speculation."  *See Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973) (noting the importance "of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently

14

be used to the client's disadvantage.").[4]  In any event, Judge Gold's view of this evidence is at least "'plausible' in light of the full record—even if another [view] is equally or more so."  *See Cooper*, 137 S. Ct. at 1465.

Further, Judge Gold found that Basil "twice served as an official at Noah Bank's annual shareholders' meetings and met from time to time with bank officers and directors 'concerning various bank matters,'" giving him knowledge of Noah Bank's "motives for completing or avoiding its obligations under the Lease."  (Disqualification Order, Dkt. 30, at 8 (quoting Basil Decl., Dkt. 28-3, ¶ 49).)  At one of the board meetings Basil attended, the members discussed their expectations for when the Noah Bank branch governed by the Lease was likely to open.  (*See* Zampino Decl., Dkt. 29-2, at ECF 124–25 (minutes from a September 20, 2018 board meeting reflecting comments that the branch in question "may open in late of [sic] 2019").)  Judge Gold thus found it "very likely that Basil and other lawyers at BLG became aware of privileged information regarding whether or not Noah Bank was making a good faith effort to obtain the permits and other approvals it was required to secure under the Lease."  (Disqualification Order, Dkt. 30, at 7.)  This is more than mere "insight into [Noah Bank]'s 'general "litigation thinking."'" *Hickman*, 371 F. Supp. 2d at 230 (citations omitted); *cf. Fernandez v. City of New York*, No. 99-CV-777 (DC), 2000 WL 297175, at *1 (S.D.N.Y. Mar. 21, 2000) (finding that "[a]lthough the arrest and prosecution that [were] the subject of the [second] lawsuit were not the subject of [counsel's] prior representation of [the defendant], there [was] still a 'substantial relationship'"

---

[4] JKAYC also contends that "applications for approval of new bank branches form part of the public record" and thus "are readily available to anyone."  (Pl. Mot., Dkt. 31-1, at 8.)  But even assuming Noah Bank applied for approval of the other branches at issue (of which JKAYC offers no evidence, despite its apparent public availability), Noah Bank's internal communications with counsel expressing enthusiasm about other branches, in the same emails concerning the Lease at issue in this case, are not "readily available to anyone."

between the two matters because "[a] reasonable likelihood exist[ed] that [counsel's] earlier representation of [the defendant] for a year and a half resulted in the acquisition by [counsel] of confidential information that could be useful to [the plaintiff] in [the second] case"); *Battagliola v. Nat'l Life Ins. Co.*, No. 03-CV-8558 (GBD) (AJP), 2005 WL 101353, at *11 (S.D.N.Y. Jan. 19, 2005) (noting that "courts in this district have ordered disqualification . . . where an attorney or law firm gained extensive or highly confidential knowledge about a client through a prior, broad-based representation and that knowledge pertained to a subsequent lawsuit to the disadvantage of the client" (citation and brackets omitted)).[5]  The information that Basil and BLG likely learned through their prior representation of Noah Bank goes to the heart of JKAYC's breach of contract claim in this action.

Finally, Judge Gold found that Kim's conflicts could be imputed to BLG.  Because Kim was the primary negotiator and drafter of the Lease on Noah Bank's behalf, Judge Gold concluded that this "provide[d] an additional basis for [BLG's] disqualification."  (Disqualification Order, Dkt. 30, at 9–10.)  Again, the Court reviews this finding for clear error.  *See Gen. Sec., Inc. v. Com. Fire & Sec., Inc.*, No. 17-CV-1194 (DRH) (AYS), 2017 WL 4119622, at *4 (E.D.N.Y. Sept. 15, 2017) ("[T]he issue of whether or not an 'of counsel' attorney's conflicts are to be imputed to a firm presents a question of fact to be applied on a case-by-case basis.").

JKAYC cites *Regal Marketing Inc. v. Sonny & Son Produce Corp.*, No. 01-CV-1911 (WK), 2002 WL 1788026, at *6 (S.D.N.Y. Aug. 1, 2002), to argue that Judge Gold clearly erred by

---

[5] Although Basil attested in his declaration that he did not speak to anyone about Noah Bank's efforts to obtain regulatory approvals (*see* Basil Decl., Dkt. 28-3, ¶ 53), Judge Gold found that even if this were true, the fact "that no one at Noah Bank spoke with Basil about the permits and approvals may in and of itself indicate that the bank did not make a good faith effort to obtain them" (Disqualification Order, Dkt. 30, at 7–8).  This, too, was a "permissible view[] of the evidence." *Bershchansky*, 788 F.3d at 110 (citation omitted).

imputing Kim's conflicts to BLG.  (Pl. Mot., Dkt. 31-1, at 16–17.)  In *Regal*, the court declined to impute the conflicts of an of-counsel attorney whose "name [did] not appear on th[e] firm's letterhead," who was "not included on [the firm's] professional liability insurance policy," and whose firm "maintain[ed] a separate phone, fax, and billing system (as well as a separate professional liability insurance policy)."  2002 WL 1788026, at *6.

As Judge Gold pointed out, however, Kim (1) "involve[d] Basil in his work—both by copying him on emails and asking him to draft a rider to the Lease," (2) "shared an office space" with BLG, and (3) "included Basil's name on his letterhead."  (Disqualification Order, Dkt. 30, at 9 (citations omitted).)  Basil, in turn, "appears to have charged Noah Bank for Kim's legal services on a single invoice listing both Kim's and Basil's hours."  (*Id.* (citations omitted); *see also* James Decl., Dkt. 29-1, ¶ 2, Ex. A.)  And "Kim . . . made a practice of copying Basil on emails because of BLG's superior document retention system."  (Disqualification Order, Dkt. 30, at 9; *see also* Kim Decl., Dkt. 28-1, ¶ 26.)  This suggests Kim did not "handle[] matters independent of [BLG] and scrupulously maintain[] files for [Noah Bank] separate from the files of [BLG]," but, rather, that Kim's "client files [were] not effectively segregated from those of [BLG]."  *See Hempstead*, 409 F.3d at 134.  Further, Kim admitted that he "generally stay[s] heavily involved in all cases that [he] refers to []BLG."  (Kim Decl., Dkt. 28-1, ¶ 18.)

JKAYC responds that "[e]ven if this imputation were warranted, it would provide no basis for disqualification, as Mr. Kim possessed no privileged information relevant to this matter."  (Pl. Mot., Dkt. 31-1, at 16.)  JKAYC points to Kim's declaration that he did not have any information about "the extent and time of efforts undertaken by Noah Bank to obtain regulatory approvals." (*Id.* (quoting Kim Decl., Dkt. 28-1, ¶ 28.))

17

But even if Kim did not have information regarding Noah Bank's efforts to obtain approvals after the Lease was signed, he likely had information about Noah Bank's views or apprehensions regarding certain Lease provisions, its enthusiasm about the agreement with JKAYC in general, and/or its likelihood of *being able* to comply.  Such information would be both confidential and material to the present suit.  Even if JKAYC is right that Noah Bank "did not take the position that the Lease would be terminated" until after Kim's representation ended (Pl. Mot., Dkt. 31-1, at 15), Kim's knowledge of Noah Bank's thoughts on entering the Lease would bear on whether Noah Bank made its later decision to terminate the Lease in bad faith.

And although the primary issue in this case is, at the moment, whether Noah Bank acted in bad faith, this ultimately is an action for breach of a Lease that Kim negotiated and wrote.  (*See* Kim Decl., Dkt. 28-1, ¶ 24.)  To the extent the meaning of any term in the Lease becomes relevant to this suit, the primary negotiator and drafter would have material privileged information.  *Cf. AVRA Surgical*, 2014 WL 2198598, at *2–4 (disqualifying counsel who represented an adverse party in negotiating the agreement that was the subject of the later lawsuit).  For example, the parties already have disagreed about the scope of Noah Bank's duties under the lease.  (*Compare* Compl., Dkt. 2, at ECF 4 (¶¶ 8(a)–(c)) (JKAYC alleging what Noah Bank "was required" to do to obtain the requisite approvals), *with* Answer, Dkt. 7, ¶ 8 (Noah Bank denying those allegations).)

Thus, Judge Gold did not clearly err in finding BLG's and Kim's past representation of Noah Bank (which extended to the drafting and execution of the Lease and Rider), and BLG's representation of JKAYC in this matter (in which breaches of both appear to be alleged), substantially related.

18

**C.     Judge Gold Appropriately Found That BLG Had Access to Relevant Privileged Information**

Judge Gold found that, "given Basil's extensive involvement in the affairs of Noah Bank and those of [Noah Bank's President] during the time period critical to the issues in this case, the likelihood that he was exposed to relevant privileged information is sufficiently great to warrant his disqualification." (Disqualification Order, Dkt. 30, at 8.)   JKAYC disputes this finding, arguing that "[e]ven if there had been a substantial relationship between []BLG's prior representation of Noah Bank and the present matter, disqualification would nevertheless be impermissible, as []BLG had no relevant privileged information." (Pl. Mot., Dkt. 31-1, at 14.) JKAYC points out that "[b]oth Mr. Basil and Mr. Kim have submitted sworn declarations specifically stating that they were uninvolved in [Noah Bank's] efforts [to secure approvals] and knew nothing about them." (*Id.*)

But "[o]nce a substantial relationship between the cases is established, where the same individual lawyer participated in the prior and current representation, the movant is not required to make a specific showing that confidences were passed to counsel." *Prevezon*, 839 F.3d at 240 (citation and quotations omitted). "Instead, the movant is entitled to the benefit of an *irrebuttable presumption* that confidences were shared." *Id.* (emphasis added) (citation omitted). Basil has appeared in this case and personally signed the complaint. (*See* Dkt. 9; Compl., Dkt. 2, at ECF 8.) Because Judge Gold did not clearly err in finding that Basil's prior representation of Noah Bank bore a substantial relationship to the present action, Noah Bank "is entitled to the benefit of an irrebuttable presumption that" Basil had relevant privileged information. *Prevezon*, 839 F.3d at 240 (citation omitted). Basil's assertion that he never received such information is immaterial.

In any event, as Judge Gold found, Basil represented Noah Bank in approximately 20 matters in mid-2019, which is when Noah Bank was obligated by the Lease to seek the permits

19

and regulatory approvals at issue.  (*See* Basil Decl., Dkt. 28-3, ¶ 31.)  And, as noted, Kim copied

Basil on emails related to the Lease, Basil drafted a section of the Lease, and Basil "twice served

as an official at Noah Bank's annual shareholders' meetings (Disqualification Order, Dkt. 30, at

8), at least one of which involved discussion of the property governed by the Lease (*see* Zampino

Decl., Dkt. 29-2, at ECF 124–25).  Judge Gold thus found it "very likely that Basil and other

lawyers at BLG became aware of privileged information regarding whether or not Noah Bank was

making a good faith effort to obtain the permits and other approvals it was required to secure under

the Lease."  (Disqualification Order, Dkt. 30, at 7.)  Given the evidence supporting this finding,

Basil's and Kim's assertions that they never received material confidential information do not

establish clear error.[6]  *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d

Cir. 2011) ("[T]hat there may have been evidence to support an inference contrary to that drawn

by the [court] does not mean that the findings made are clearly erroneous." (citation omitted)).

Nor did Judge Gold clearly err in declining to find that "the screening between [Kim] and

[BLG]" was "adequate to rebut the presumption of shared confidences."  *Hempstead*, 409 F.3d at

133.  For the reasons discussed, there appears to have been little, if any, screening between Kim

and BLG.  For instance, Kim's "practice of copying Basil on emails because of BLG's superior

document retention system" suggests there was *no* barrier between Kim and BLG regarding client

information.  (Disqualification Order, Dkt. 30, at 9; *see also* Kim Decl., Dkt. 28-1, ¶ 26.)

\* \* \* \*

Given Judge Gold's "broad discretion" as to disqualification, *Canfield*, 2020 WL 3960929,

at \*2, and after "resolv[ing] any doubts in favor of disqualification," *Benevida Foods*, 2016 WL

---

[6] In fact, as Judge Gold observed, "that no one at Noah Bank spoke with Basil about the permits and approvals may in and of itself" be relevant to any good faith defense Noah Bank might have in this case.  (Disqualification Order, Dkt. 30, at 7–8.)

3453342, at *10 (citations and quotations omitted), the Court cannot conclude that Judge Gold's findings leave "the definite and firm conviction that a mistake has been committed," *Castillo*, 950 F.3d at 167 (citations and quotations omitted).[7]  The Court therefore overrules JKAYC's objections to Judge Gold's decision disqualifying JKAYC's counsel.

## CONCLUSION

The Court declines to set aside the decision of the Honorable Steven M. Gold disqualifying attorney Robert J. Basil and his law firm, the Basil Law Group, P.C., from representing Plaintiff JKAYC, LLC in this matter.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 30, 2021
            Brooklyn, New York

---

[7] JKAYC also contends that Noah Bank's failure to seek disqualification until September 2020, despite the suit beginning in November 2019, "militate[s] against disqualification."  (Pl. Mot., Dkt. 31-1, at 17.)  JKAYC cites, among others, *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 456 (S.D.N.Y. 2000), where the court declined to disqualify an attorney because the moving party "sat on its hands for too long to have substantial claims on the Court's exercise of its discretion."  But Judge Gold found that "this litigation is not so far along that new counsel cannot be easily brought up to speed[,] discovery is in its early stages and depositions have not yet begun," and "any reasonable additional time that new counsel for JKAYC might require to become familiar with the case will be provided."  (Disqualification Order, Dkt. 30, at 10.)  JKAYC has asked the Court to review Judge Gold's decision under the deferential standard applicable under Federal Rule of Civil Procedure 72(a), not to "exercise [] its discretion" as the court was entitled to do in *Reimerdes*.  The Court declines to upset Judge Gold's conclusions.